UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

DERRICK DEACON,

                         Plaintiff,

        -against-

THE CITY OF NEW YORK; New York City
Police Department ("NYPD") Detective TRENT
TURNER, 71st Precinct, Shield # 00760; NYPD
Detective DARCY CALLAHAN, Brooklyn South
Homicide Squad ("BSHS"), Shield # 00438;
NYPD Officers John Doe # 1-5; District Attorney
Investigators John Roe # 1-5,

                         Defendants.

**COMPLAINT &
JURY DEMAND**

**CASE NO:  15-CV-843**

## PRELIMINARY STATEMENT

1.      Plaintiff Derrick Deacon spent nearly twenty-five years in prison for a crime he did not commit.

2.      Deacon had nothing to do with the homicide of Anthony Wynn, but he was wrongfully accused, tried by the Office of the Kings County District Attorney ("DA"), and convicted of murder in 1989.  He was not released from prison, and his name was not cleared, until 2013.

3.       Defendants Trent Turner and Darcy Callahan were New York City Police Department ("NYPD") detectives who led the investigation that wrongfully implicated Deacon. Their intentional misconduct, along with that of other investigators from the NYPD and/or the DA's office, led directly to Deacon's wrongful arrest, unfair trial, wrongful conviction, and false imprisonment.

1

4.      Turner, Callahan, and the other NYPD officers who investigated Wynn's murder, John Doe #1-5 (collectively, "Officer Defendants"), failed to conduct a competent investigation. In the first five days after the murder, they set about their job of determining who had killed Wynn.  They interviewed building residents, obtained a description of the perpetrator from two witnesses, searched police records for other crimes in the neighborhood committed by someone who matched that description, and spoke to the victim's relatives about possible suspects.

5.      But on the sixth day of their investigation, the Officer Defendants' objective shifted.  Beginning on April 6, 1989, instead of identifying the true killer, the Officer Defendants concentrated their energies on ensuring that Derrick Deacon would be convicted of the crime, whether or not he had committed it.

6.      The catalyst for this change was Abdullah Pickering, a resident of 105 Lincoln Road, the building in which Wynn was shot.  Offered at $1000 reward for information about the homicide, Pickering told the detectives that had seen Deacon—whom he referred to by the nickname "Fire"—shoot Wynn.  Pickering's story was facially unreliable.

7.      Most glaringly, Pickering's account contradicted the statements of other witnesses who had already been interviewed by the police.  The killer as described by other witnesses looked nothing like Deacon, and the movements attributed to Deacon by Pickering conflicted with what other residents of the building had told the police.

8.      Nevertheless, within an hour of hearing Pickering's story, the Officer Defendants had arrested Deacon and closed their investigation.  They were all too happy to have identified a culprit and, unconcerned with the truth, they immediately set about ignoring and—worse— suppressing all evidence that implied Deacon's innocence or could hamper his eventual prosecution.

9.      To the Officer Defendants, Deacon appeared a convenient scapegoat.  Pickering reported that Deacon was a nuisance at 105 Lincoln Road, a man who did not live there but was a regular visitor.  He claimed that Deacon had committed other crimes and had harassed and even assaulted other residents in the building.

10.      The Officer Defendants accepted Pickering's accusations at face value.  They never spoke to the alleged other victims of Deacon's misconduct or made any effort to determine whether such misconduct had occurred.  In fact, the residents whom the Officer Defendants subsequently questioned about Deacon indicated that they were on friendly terms with him and that he was a frequent visitor in the building because he was welcomed by many of its residents.

11.      By that time, however, the Officer Defendants had abandoned all efforts to determine the truth of Deacon's alleged guilt.  At the time, homicides in the city were at an all-time high, and the Officer Defendants operated in a police department that routinely "investigated," closed, and prosecuted cases on the basis of perjury and falsified evidence.  Knowing that they would face no consequences for similar misconduct, the Officer Defendants were concerned only with ensuring that Deacon would take the fall for Wynn's murder.

12.      The focus of their attention was a woman named Colleen Campbell.  Campbell, a resident of 105 Lincoln Road, had told Turner on the day of the murder that she had looked the murderer in the face as he fled from the scene of the crime with a gun in his hand.  Campbell provided a description of the man she had seen.  He looked nothing like Derrick Deacon.

13.      Campbell's statements were memorialized in a Form DD-5, which was part of the investigative file and presented an obvious obstacle to an easy conviction of Deacon.

14.      After Pickering had named Deacon as the murderer, the Officer Defendants, including Turner and Callahan, therefore returned to Campbell and showed her a picture of

3

Deacon, asking if he was the man she had seen on the day of the murder.  Campbell told them that he was not.  She said that she knew Deacon, whom she also referred to as "Fire," that he was a frequent visitor at 105 Lincoln Road, and that she sometimes exchanged greetings with him. By Contrast, Campbell told the detectives, she did not know the man whom she had seen with a gun.  She also pointed out that Deacon was at least a decade older than the perpetrator and had a beard and a moustache, while the perpetrator was clean-shaven.  The Officer Defendants did not record this conversation with Campbell in a DD-5 or anywhere else in the police file.

15.     Dissatisfied with her response, the Officer Defendants repeatedly visited Campbell, showing her Deacon's picture and asking whether he was the man she had seen. Campbell never budged from the truth.  She continued to tell the detectives that they had the wrong man.

16.     The Officer Defendants made no note of their follow-up interviews with Campbell.  They were not documented in Forms DD-5 or anywhere else in the police file.  Upon information and belief, they did not disclose the negative identifications to Assistant District Attorney ("ADA") Thomas Merrill, who would later try Deacon, or the other prosecutors assisting Merrill with the case.  Nor did they tell Deacon or his defense counsel that Campbell had repeatedly told them that Deacon was not the murderer.

17.     The Form DD-5 recounting Campbell's description of the fleeing suspect, however, had been turned over to the defense and made Campbell a likely defense witness, even if the Officer Defendants' failure to disclose Campbell's repeated negative identifications prevented Deacon's attorney from knowing the full extent of the exculpatory evidence that Campbell had provided.

18.     As Deacon's trial approached, the Officer Defendants, ADA Merrill, and the other

ADAs assisting him with Deacon's prosecution (collectively, "the ADAs") recognized that

neutralizing Campbell's testimony was an important task if the criminal case against Deacon was

to be won.  They saw an opening in the DD-5, which stated that Campbell had "looked [the

shooter] in the face but also coward [sic] in fear of him" as she "moved aside to let him pass."

The Officer Defendants and ADAs believed that the second half of this statement left room for

Campbell to testify that she had not clearly registered the shooter's appearance and could not be

certain whether he was Deacon.  The ADAs believed that this strategy could work only because

they did not know—and, in turn, neither the defense nor the jury would find out— that Campbell

had also told the Officer Defendants, multiple times, that she knew Deacon was not the shooter.

19.     Days before Campbell was to appear in court as a defense witness, the ADAs sent

several officers to her home to ask her to come in for an interview.  These officers were

investigators from the DA's office and/or NYPD officers, including some or all of the Officer

Defendants, including Turner and/or Callahan and/or other NYPD officers.

20.     These officers (together, "Interrogation Defendants"), realizing that Campbell's

testimony could fatally undermine the prosecution, determined to make her change her story at

any cost. They began by telling Campbell when they confronted her in her home that she would

have to cooperate with them and with the ADAs, or that she would lose custody of her children.

They presented her with a bottle of bleach that they found in an illegal search of her apartment

and, noting that it was dangerous to keep bleach within reach of children, told her that her

children would be taken away if she did not assist them with Deacon's case.  Campbell was

terrified.  She resolved to do whatever she was told.

21.     The Interrogation Defendants forced Campbell to accompany them to the DA's office, where she submitted to a polygraph examination.  Again, Campbell stated unequivocally that Deacon was not the man she had seen fleeing with a gun on the day of the murder.  The Interrogation Defendants recorded her statement, which the polygraph established was true.

22.     Following the polygraph, the Interrogation Defendants directed Campbell to change her story.  When she testified at trial, they told her, she should say that she never looked directly into the face of the man who passed her on the stairs and that she was unsure whether that man was Deacon.  Still terrified about losing custody of her children, Campbell agreed to deliver the Interrogation Defendants' fabricated testimony.

23.     Campbell also met with ADA Merrill and/or other of the ADAs that day.  The ADAs saw the results of Campbell's polygraph exam.  On information and belief, the ADAs did not know about Campbell's multiple prior negative identifications, and they did not know that Campbell had been told by the Interrogation Defendants to lie on pain of losing her children. But when they saw Campbell's polygraphed statement exonerating Deacon, the ADAs learned that she knew that Deacon was not the shooter, and that her testimony could therefore destroy their case against him.  The DA's office, like the NYPD, was at the time bent on obtaining convictions by whatever means possible, whether those means revealed or concealed the truth, ane even when they were unconstitutional.  The ADAs therefore instructed Campbell in turn to say that she could not be sure whom she had seen with the gun.

24.     At Deacon's trial, cowed by the Interrogation Defendants' threats of losing her children, Campbell delivered the testimony that she had been fed first by the Interrogation Defendants and then, independently, by the ADAs.

25.     At the time of trial, Deacon did not know that Campbell's testimony had been fabricated by NYPD officers and/or DA investigators; that Campbell adopted that testimony because she had been threatened with the loss of her children; or that Campbell had repeatedly and consistently told the Officer Defendants that she knew Deacon was not the shooter.  The Officer Defendants and Interrogation Defendants withheld this information from the ADAs in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.   Deacon also did not know at the time of trial that Campbell again exonerated Deacon in the DA's office while undergoing—and passing—a polygraph examination mere days before she testified. That information was also withheld from the defense by the ADA in violation of *Brady*.

26.     Deacon did not learn of this exculpatory evidence until after he had lost his appeals, and had spent over two decades in prison for a crime he did not commit.  Deacon discovered these facts while pursuing a claim of innocence after he finally identified Anthony Wynn's true killer.

27.     The killer's identity was revealed in the course of a 2001 investigation by the FBI and the United States Attorney's Office for the Eastern District of New York into the activities of a violent gang known as the Patio Crew, with which Deacon had no connection.  The investigation showed that Paul Gary Watson, a/k/a "Pablo," a member of the gang, committed the Wynn murder and then talked openly about it with his friends.  These belatedly unearthed facts induced the Appellate Division, Second Department to grant Deacon a new trial.

28.     While preparing his petition to vacate his conviction, Deacon uncovered the truth about Colleen Campbell's testimony and the Officer Defendants', Interrogation Defendants', and ADAs' misdeeds.  At his retrial, Campbell testified truthfully.  It took the jury nine minutes to acquit Deacon of all charges.

29.     This is a civil action pressing claims pursuant to 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments to the United States Constitution, and New York law.  This action seeks monetary damages for Deacon's unlawful arrest, malicious criminal prosecution, wrongful conviction, and false imprisonment due to violations of his fundamental federal constitutional rights to due process and to be free from unreasonable search and seizure.

30.     The Officer Defendants and Interrogation Defendants (collectively, "Individual Defendants") instigated and continued the prosecution of Deacon without probable cause to believe him to be guilty of the crimes charged, and they failed to turn over exculpatory evidence to the District Attorney's Office.  The Individual Defendants manufactured evidence through highly suggestive, unfair, and unreliable investigative procedures that tainted a witness's recollections and encouraged perjured testimony.  The ADAs likewise elicited testimony at Deacon's criminal trial that they knew to be false, and they failed to turn over exculpatory evidence to the defense.  The Individual Defendants' and ADAs' misconduct led to the wrongful and unjust prosecution of Deacon and the loss of his freedom for almost half his life.

## JURY DEMAND

31.     Plaintiff demands trial by jury in this action.

## PARTIES AND JURISDICTION

32.     This Court has original subject matter jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) because Plaintiff's claims arise under a law of the United States, namely 42 U.S.C. § 1983, and seek redress of the deprivation, under color of State law, of rights guaranteed by the Constitution of the United States.

33.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

34.     Plaintiff has complied with the requirements of New York General Municipal Law Section 50-i by serving on the Office of the Comptroller of the City of New York a notice of claim on November 19, 2013.  More than 30 days have elapsed since Plaintiff served those notices of claim and no offer of settlement has been made.

35.     Plaintiff submitted to a hearing pursuant to New York General Municipal Law Section 50-h on April 22, 2014.

36.     Venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b) because Plaintiff's claims arose in this judicial district.

37.     At all times herein mentioned, Plaintiff was a resident of Kings County, City and State of New York.

38.     Defendant City of New York ("City") is a municipal corporation existing by virtue of the laws of the State of New York.

39.     Defendant Trent Turner was at all relevant times a detective employed by the NYPD.  He is named here in his individual capacity.

40.     Defendant Darcy Callahan was at all relevant times a detective employed by the NYPD.  He is named here in his individual capacity.

41.     NYPD Detectives John Doe # 1-5 were at all relevant times detectives employed by the NYPD.  They are named here in their individual capacities.

42.     Defendants District Attorney Investigators John Roe # 1-5 were at all relevant times investigators employed by the Kings County District Attorney's Office.  They are named here in their individual capacities.

43.     At all times relevant to this Complaint, defendants Turner, Callahan, John Doe # 1-5, and John Roe # 1-5 (collectively, "Individual Defendants") acted toward Plaintiff under

color of the statutes, ordinances, customs, and usage of the State and City of New York, and within the scope of their employment.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### The Murder of Anthony Wynn by Paul Gary Watson AKA "Pablo"

44.     The murder for which Deacon was wrongfully convicted occurred on Saturday April 1, 1989.  Between 10:00 and 11:00 a.m., 16-year-old Anthony Wynn was shot in the third-floor stairwell of 105 Lincoln Road in the Flatbush section of Brooklyn.

45.     At the time, 105 Lincoln Road was at the heart of a neighborhood plagued by the violent activities of a gang known as the Patio Crew.  The Patio Crew distributed crack cocaine, and its members engaged in frequent shootings, robberies, and murders.  Among the senior members of the organization in 1989 was a man named Trevor Brown.

46.     On April 1, 1989, Brown lived at 131 Lincoln Road.  131 Lincoln Road is approximately 65 yards from 105 Lincoln Road, where Wynn was shot. The roofs of the buildings are connected, and a person can travel from one building to the other by walking across the roofs.

47.     Leading up to the date of Wynn's murder, a younger member of the Patio Crew, Paul Gary Watson, also known as "Pablo," was living with Brown in his apartment.  Not long before the murder, Brown listened to Pablo and two other Crew members, Jermaine "J.T." Dixon and Michael "Smiley" Nembhardt, describe plan to rob a young man who regularly visited 105 Lincoln Road to buy large quantities of drugs.  Pablo and his two friends discussed their plan multiple times in Brown's presence.

48.     On March 31, 1989, the night before Wynn died, Pablo was inside Brown's apartment, again discussing his plan to rob the young drug dealer at 105 Lincoln Road.  That night, he had a gun with him that he fidgeted with constantly as he talked.

49.     The next morning, on April 1, Brown was at home, sleeping.  Pablo ran into the apartment, waking Brown.  Pacing nervously across the floor, Pablo told Brown that he had just killed a man in 105 Lincoln Road.  Pablo said he had attempted to rob the young man as planned, but when the man resisted, Pablo shot him.  Pablo was extremely agitated by what he had done and asked Brown to procure marijuana for him, which he smoked to calm his nerves.

50.     Brown left his apartment and walked over to 105 Lincoln Road, went up to the third floor, and saw Wynn lying dead in the stairwell.

### The 1989 Police Investigation

51.     The nearest apartment to the stairwell where Wynn's body lay was Apartment 3C, in which Everton "Tonka" Pencil lived.  At the moment that Wynn was shot, Pencil was at home, asleep with his partner, Marie Spencer, in the living room of their apartment.  Pencil's sister, Leslene Muirhead, was asleep in the bedroom adjacent to the hallway.  At around 10:45 a.m., Muirhead came into the living room where Pencil and Spencer slept and told Pencil that she had heard a loud bang in the hallway.  Pencil stepped into the hall to see what had happened and saw Wynn lying on the stairway.  Pencil returned to his apartment and told Muirhead to call the police, which she did.

52.     NYPD Officer John Biagini heard over his radio that a man had been shot at 105 Lincoln Road.  Biagini was the first to arrive at the location, where he found over a dozen people waiting outside of the building and several more on the landing by Wynn's body.  Biagini was

soon joined by other officers including defendants NYPD Detectives Trent Turner and Darcy Callahan.

53.     The officers recovered a vial of crack cocaine and $600 in small bills from Wynn's jacket pocket.  Although he was only 16 years old at the time of his death, Wynn's autopsy revealed a bullet lodged in his chest from a previous violent encounter.

54.     The officers began to interview residents of the building.  At around 1:00 p.m., officers including Callahan visited Apartment 3C, where they spoke to Pencil and Muirhead.  They told the officers that they had been at home when they heard the shot, stepped outside to see what had happened, and called the police.

55.     Deacon arrived at Apartment 3C while Pencil was being interviewed.  Deacon had been passing by 105 Lincoln Road that afternoon, several hours after Wynn was shot, and he saw NYPD patrol cars and a crowd of people outside the building.  Deacon frequently spent time in the building, visiting his friends, who included Pencil.  Sometimes he assisted the building's superintendent, another friend, by cleaning floors.

56.     When he saw the police activity around the building, Deacon went inside and up to Pencil's apartment to ask his friend what had happened.  He found the police there, asking Pencil questions, and was also questioned by the officers.  Deacon explained that he had been at 101 Lincoln Road that morning and had just arrived at 105 Lincoln Road, that was there to visit his friends, and that did not know anything about the shooting.

57.     Meanwhile, officers including Turner spoke to another resident of 105 Lincoln Road, Colleen Campbell.  Campbell told the officers that she had been talking to a neighbor named Dawn on the sixth floor of the building when she heard noises from a lower floor, followed by a bang.  Campbell told Turner that when she went to see what had caused the bang,

she encountered a man on the stairs, coming up from below.  He was holding several thick gold chains in one hand and a gun in the other.  Campbell looked the man in the face before she moved aside to let him pass.  He continued up the stairs and onto the roof.

58.    Campbell described the man as black, of light to medium complexion, about 5'7" tall, of medium build, clean shaven, around 19 years of age or in his early 20s, and wearing blue jeans and a black and white sweater with a red, yellow, and blue flower print.

59.    Dawn Johnson, interviewed that same day by officers including Callahan, corroborated Campbell's account.  She had also heard a gunshot and then had seen a man go up the stairs toward to the roof, where he exited the building onto the roof.  Johnson described a black man of medium complexion, in his twenties, wearing a sweater with yellow and black in it.

60.    The descriptions provided by Campbell and Johnson matched the appearance of Pablo who, moments after they saw him, had confessed to Brown that he had murdered Wynn.  Campbell's and Johnson's descriptions did not match the appearance of Deacon.  At the time, Deacon was 34 years old and 6' tall.  He had a beard, moustache, medium length hair, and a dark complexion.

61.    In the days that followed, NYPD officers, including Detectives Turner, Callahan, and other of the Officer Defendants, continued to interview residents of 105 Lincoln Road, showing them photographs of Wynn and asking whether they knew him or had information about his murder.

62.    Deacon, visiting 105 Lincoln Road during that time, encountered NYPD officers, including Turner, several times.  Each time, the officers showed Deacon a picture of Wynn.  Deacon reminded the officers that he had already been questioned and that he had no information.  The officers apologized.

63.     Because they generated no useful leads by showing residents photographs of

Wynn, on April 5, the investigating officers decided to offer a reward for information about his

death.

64.     That day, NYPD officers including Turner, Callahan, and other Officer

Defendants, returned to 105 Lincoln Road with flyers advertising a $1000 reward to anyone who

called the NYPD Crime Stoppers TIPS hotline with information about the murder.  Turner,

Callahan, and their fellow officers distributed dozens of cards to residents of 105 Lincoln Road

and posted more inside the building.  On April 6, the offers distributed additional flyers in and

around 105 Lincoln Road.

65.     Among the residents who saw the offer of a reward advertised on April 6 was

Abdullah Pickering, a resident of 105 Lincoln Road.  That very day, he called the TIPS hotline to

report that he had witnessed Wynn's murder, and that Deacon, whom he referred to as "Fire,"

had committed it.

66.     At Deacon's trial, Pickering insisted that he contacted Crime Stoppers because he

was concerned for the safety of his wife and children.  But for almost a week after the murder, he

saw Deacon at 105 Lincoln Road every day and yet remained silent about what he would later

claim to have witnessed, although NYPD officers were constantly present in the building, asking

residents for information about the crime.  He waited until a $1000 reward was offered before he

pointed his finger at Deacon.

67.     On April 6, Pickering reported—first to the TIPS line operator and then in

interviews with Officer Defendants, including Turner and Callahan, and with ADA John

Feldman—that he had seen a man named "Fire" exchange money and drugs with Wynn in the

lobby of 105 Lincoln Road.  Pickering reported that Fire returned to Apartment 3C and went

14

inside.   Pickering said that Wynn followed Fire up the stairs and rang the bell, and Fire emerged to argue with him.  According to Pickering, Fire then shot Wynn.

68.     Pickering described Fire as 6' tall, dark, with a short afro, unshaven with a mustache, and wearing a brown and gray striped sweater with beige pants and a shirt.  This description quite obviously and directly contradicted the description of the fleeing perpetrator provided by Campbell and Johnson on the day of the murder.

69.     Shortly after his interview with the officers and ADA Feldman on April 7, Pickering called the hotline again to report that Fire was outside of 105 Lincoln Road.   Officer Defendants including Turner and Callahan arrived at the building, where they arrested Deacon on the sidewalk between 101 and 105 Lincoln Road.  Deacon denied any involvement in the shooting.  He remarked to the officers that a man who had murdered someone would not have returned to the scene of the crime within hours, while police officers were there, investigating the crime.

70.     The Officer Defendants, including Turner and Callahan, knew or should have known that they did not have probable cause to arrest and prosecute Deacon for Wynn's murder. They ignored compelling evidence that Deacon had not committed the murder.  They also failed to assess Pickering's version of events by examining the crime scene for physical evidence or making further inquiry of eyewitnesses other than Pickering.

71.     Ignoring Deacon's assertion of innocence, the Officer Defendants nonetheless charged him with second-degree murder.  Upon his arrest, they immediately deemed the case closed and ceased their investigation.

**The Officer Defendants' Malicious and Deliberately Indifferent Failure to Investigate**

72.     Despite the obvious conflict between Pickering's statements and the statements of other witnesses, the Officer Defendants failed to undertake even basic investigation tasks to assess Pickering's account.  Instead, they focused their energies entirely on ensuring that Deacon would be convicted of the homicide, whether or not he was guilty.

73.     For instance, Pickering claimed that he had seen Deacon and Wynn exchange money and drug vials, but Turner and Callahan never tested the money or drugs that they found on Wynn's body for fingerprints.

74.     They also never interviewed any of the potential witnesses identified by Pickering.  For example, they did not interview two residents to whom Pickering claimed to have been speaking in the minutes before Wynn was shot.  Indeed, one of these witnesses had been interviewed on the day of the murder and had told officers that she had heard nothing—a statement that undermined Pickering's story, as he claimed to have been with her when he heard Deacon and Wynn arguing.  The Officer Defendants never returned to this witness or otherwise attempted to resolve the discrepancy.

75.     The Officer Defendants also failed to examine discrepancies between Pickering's statement and those of other witnesses, even though numerous other witnesses gave accounts that contradicted Pickering's in some way.  Instead, the Officer Defendants chose to ignore all evidence that cast doubt on Pickering's tale.  For example, they never re-interviewed Dawn Johnson, who gave a description of the suspect that in no way matched either Deacon's appearance or Pickering's description of the killer with respect to age, skin color, or clothing.

76.     The Officer Defendants also did not re-interview Pencil or Muirhead, who told Callahan on the day of the murder that they had been at home, asleep, in Apartment 3C when

they heard the shot.  The Officer Defendants also never spoke to Spencer, who was also inside Apartment 3C at the time of the shooting.  According to Pickering, Deacon was in and out of Apartment 3C in the minutes leading up to Wynn's death; Wynn rang the apartment's doorbell moments before he was shot; and Deacon and Wynn argued loudly in the hallway right outside Apartment 3C.  Had the Officer Defendants questioned Pencil, Muirhead, and Spencer after interviewing Pickering, they would have learned that they were alone in Apartment 3C all morning on April 1, 1989, and that none of them saw Deacon until he arrived at their apartment that afternoon, hours after Wynn had already died.  They would have confirmed, in other words, that Pickering was not telling the truth.

77.    The Officer Defendants' failure to investigate confirms their indifference to Deacon's innocence and their improper reliance on testimony that they knew to be unreliable at best.

**The Officer Defendants' Malicious Suppression of Campbell's Negative Identifications**

78.    Even more shocking was the Officer Defendants' conduct with respect to Colleen Campbell, another witness whose account undermined Pickering's story.  The Officer Defendants did not merely ignore Campbell's statements exculpating Deacon, as they had with respect to other witnesses; instead, they continually harassed her, encouraging her to identify Deacon as the killer to conform to Pickering's account and making no record of their conversations when she refused.

79.    Shortly after Deacon's arrest, Officer Defendants including Turner and Callahan began once again to question Campbell, who, on the day of the shooting, had provided a description of the murderer that in no way resembled Deacon.  Repeatedly, the officers showed

Campbell a photograph of Deacon and asked whether he was the man she had seen fleeing from the scene of the crime.  Repeatedly, Campbell told them unequivocally that he was not.

80.     Prior to the shooting, Campbell knew Deacon by sight and by the name Fire.  He was regularly inside 105 Lincoln Road, and she saw him frequently over the three years leading up to the murder.

81.     Multiple times, following Deacon's arrest, Officer Defendants visited Campbell's apartment, showing her pictures of Deacon and asking whether he was the man she had seen on April 1.  Each time, Campbell said no.  She reminded them that the man she had seen was younger than Deacon and, unlike Deacon, was clean-shaven.

82.     The Officer Defendants never documented these visits, and they never disclosed to the ADAs Campbell's repeated and consistent assertions that Deacon was not the man who had shot Wynn.

83.     This information should have been turned over to the defense at Deacon's trial under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.  But this evidence was never disclosed to Deacon at any point, including while he was appealing his wrongful conviction.

84.     During Deacon's trial, the jury was never informed that Campbell not only had provided a description of the suspect that did not match Deacon's appearance, but had affirmatively stated, on multiple occasions, that Deacon was not the man she had seen fleeing. They were left with uncontradicted evidence that Campbell could not be sure whether the man carrying the gun was Deacon.

85.     The existence of this undisclosed *Brady* material undermines confidence in the conviction that caused Deacon to spend nearly twenty-five years in prison.  Had it been established that Campbell knew that the killer was not Deacon, and that she consistently asserted

her certainty of that fact, Pickering's account—the only evidence of Deacon's guilt—would have been exposed as unreliable.

### The Interrogation Defendants' Malicious Coercion of Campbell

86.     As the Officer Defendants continued to visit Campbell's apartment in the months following Deacon's arrest and leading up to his trial, she stopped answering her door and eventually refused to speak with them.  Finally, on the day after Deacon's criminal trial began, several NYPD detectives and/or DA investigators (the "Interrogation Defendants") forced their way into her apartment.

87.     Campbell's initial statement to the police providing a description of a suspect who did not resemble Deacon made her a likely witness at Deacon's trial.  It also made her a very dangerous witness for the prosecution's case.  Even though Deacon and his counsel did not know about Campbell's repeated negative identifications of Deacon as the suspect, her description of a man who did not resemble Deacon threatened introduce reasonable doubt about Pickering's identification of Deacon as the murderer.   Both the Interrogation Defendants and the DA were concerned about Campbell's testimony unraveling their case against Deacon.

88.     On December 12, 1989, one week before she was to appear in court, Campbell left her apartment briefly to visit the laundry.  When she returned, she found at least two Interrogation Defendants inside her apartment.  They had persuaded her four- and five-year-old nephews to let them into the apartment, which they had then proceeded to search without cause and without a warrant.

89.     When Campbell entered the apartment, the Interrogation Defendants showed her a bottle of bleach that they had found in the kitchen.  They told her that it was dangerous to leave small children alone in an apartment with bleach and Ajax, and they threatened to take the

children away if she did not cooperate with them. Campbell was terrified. She felt forced to comply with whatever she was told to do.

90. Although there was no basis for her arrest, the Interrogation Defendants then said that they were going to handcuff her and take her to the DA's office. Campbell said she would comply without handcuffs and was taken to the DA's office in Downtown Brooklyn.

91. On information and belief, the Interrogation Defendants were not authorized or directed by the ADAs to threaten and intimidate Campbell, nor did they ever disclose to the ADAs that they had done so.

92. At the office, Campbell submitted to a polygraph exam administered by one of the Interrogation Defendants. She was asked, first, whether she saw Fire on the stairs after she heard the shot on April 1, and, second, whether she saw Fire on the stairs with the chain on April 1. Campbell answered no to both questions, and the polygraph registered unequivocally that her responses were truthful. The questions and Campbell's answers, which clearly indicated Campbell's statements that Deacon was not the perpetrator, were also documented and placed within the DA's case file. However, they were not disclosed to Deacon or his attorney.

93. After she passed the polygraph, Campbell was taken into a separate room where she was again interviewed by the Interrogation Defendants. The Interrogation Defendants told her not to testify truthfully at Deacon's trial. They instructed her that when she was asked in court if the man she had seen in the stairwell on April 1 was Deacon, she should *not* answer as she had consistently answered since she was first interviewed by Turner—*i.e.*, that she should *not* deny that Deacon was the man she saw. Instead, the Interrogation Defendants directed Campbell, she should equivocate and tell the jury that she could not be sure whom she had seen.

94.     Evidencing their utter and deliberate indifference to the question of Deacon's guilt or innocence, the Interrogation Defendants told Campbell that, although Deacon may not have murdered Anthony Wynn, he had doubtless committed other crimes and deserved to be in prison.

95.     The tactics used by the Interrogation Defendants to secure Deacon's conviction were unconstitutional and improper.  These tactics included, but were not limited to, manufacturing testimony for Colleen Campbell to deliver at Deacon's trial; threatening Campbell with loss of her children if she did not comply with the Individual Defendants' instructions, including to deliver the false testimony as instructed; and failing to turn over exculpatory evidence, including the threats that they had used to coerce her.

96.     This information should have been turned over to the defense at Deacon's trial under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.  But, upon information and belief, this evidence was never disclosed to the ADAs, and it was not disclosed Deacon before, during or after his trial, including while he was appealing his wrongful conviction.

97.     During Deacon's trial, the jury was never informed that Campbell had been threatened and frightened into altering her testimony.  They did not know that Campbell was browbeaten into concealing her certainty that the man who had shot Wynn was not Derrick Deacon.

### The ADA's Planting of Perjurious Testimony

98.     The Interrogation Defendants then took Campbell to meet with ADAs, including ADA Jane Roe, who was assisting Merrill to prepare for trial.  Jane Roe, in turn, questioned Campbell.  Upon information and belief, Jane Roe reiterated what she did not realize the Interrogation Defendants had already told Campbell: that she should not tell the jury what she

had told the polygrapher, but should instead express uncertainty over whether Deacon was the man she had seen fleeing with a gun on the day of Wynn's murder.  On information and belief, Jane Roe did not know that Campbell had already been threatened with the loss of her children if she did not deliver this testimony.

99.     Campbell was then placed under oath and the remainder of the interview was recorded.  Intimidated by the Interrogation Defendants' visit to her home, her forced transportation to the DA's office, and the polygraph exam—and, above all, terrified by the Interrogation Defendants' threat to take away her children if she did not do as they said—Campbell abandoned the truth and adopted the story that the Interrogation Defendants and the ADAs had fed to her moments before.  She told ADA Jane Roe that she did not get a good look at the man who passed her on the stairs on April 1, and that she could not say whether that man had been Deacon.

### Deacon's Criminal Trial

100.     While Campbell was being threatened and coerced by the Interrogation Defendants, Derrick Deacon's trial for the murder of Anthony Wynn had begun, conducted by ADA Merrill.

101.     Deacon had been indicted on April 28, 1989 on two counts each of second degree murder and first degree robbery and one count of second degree criminal possession of a weapon (Kings Indictment No. 4919/89).

102.     The trial began on December 11, 1989.  Deacon's attorney opened the case by promising the jury that he would present a witness to "show that the perpetrator who fled the scene of the crime was not [Deacon]."  Deacon and his attorney did not know that that witness,

Colleen Campbell, would be terrorized into changing her testimony.  Deacon would not find that out until he had spent two decades in prison for the murder he did not commit.

103.    Deacon and his attorney also did not know that—prior to the threats she received on December 12, 1989—Campbell had repeatedly asserted that Deacon was not the perpetrator. Deacon's attorney did not know that Campbell had been shown a photograph of Deacon by the Officer Defendants multiple times and that, each time, she had reiterated that he was not the man she had seen fleeing the scene of the crime—that the man she had seen was younger and without facial hair.

104.    However, based on the description of the fleeing suspect that Campbell had given to Turner on April 1, Deacon and his attorney expected that Campbell would describe for the jury a man who did not resemble Deacon.

105.    They were unprepared for the testimony that Campbell instead delivered: the testimony that had been manufactured by the Interrogation Defendants and the ADAs.  Campbell testified that she "barely glimpsed the person" who ran past her, could not tell who he was, did not know or remember his height, did not know how old he was, and did not know whether he had facial hair.  Campbell did not tell the jury that she knew the man to be someone other than Deacon.

106.    Campbell testified falsely because she was threatened, coerced, and intimidated by the Interrogation Defendants to lie.  The Interrogation Defendants knew that her testimony was false, as did the ADAs.

107.    Deacon and his attorney did not know that Campbell's testimony had been devised by the Interrogation Defendants and the ADAs or that she had been terrorized by the Interrogation Defendants into adopting it.  Without that information, defense counsel was unable

to cross-examine Campbell on her motives for backing away from the description she had initially provided to the police.

108.    Deacon and his attorney also did not know that, in addition to providing a description of the murderer, Campbell had affirmatively told the Officer Defendants multiple times that Deacon was not the right man.   Without this information, defense counsel was unable to cross-examine Campbell effectively.

109.    Without Campbell's truthful, exculpatory account, without evidence that Campbell had positively exonerated Deacon, and because of her coerced perjury, Deacon was convicted on December 21, 1989, of two counts of murder in the second degree, robbery in the first degree, and criminal possession of a weapon in the second degree.

110.    On January 12, 1990, Deacon was sentenced to 25 years to life on the murder charge, 8 1/3 to 25 years on the robbery charge, and 5 to 15 years on the weapons charge, to run concurrently.

### Deacon's Appeals and Initial Post-Conviction Proceedings

111.    Deacon appealed his conviction.  On May 18, 1992, the Appellate Division, Second Department, affirmed the conviction.  *People v. Deacon*, 183 A.D.2d 843 (2d Dep't 1992).  On August 16, 1993, the Court of Appeals denied leave to appeal.  *People v. Deacon*, 82 N.Y.2d 716 (1993).

112.    Deacon filed a writ of error coram nobis, which was denied on August 25, 1997. *People v. Deacon*, 242 A.D.2d 348 (2d Dep't 1997).

113.    At each stage of these appellate and post-conviction proceedings, the Kings County District Attorney's Office fought to preserve Deacon's conviction and opposed any relief.

24

### The Exposure of Paul Watson's Guilt

114.    In 2001, after Deacon had spent over a decade in prison for Wynn's murder, the FBI and the U.S. Attorney's Office for the Eastern District of New York were investigating the activities of the Patio Crew.  On June 19, 2001, in connection with that investigation, Trevor Brown made a proffer to Assistant U.S. Attorney Pamela Chen, FBI Special Agents Christopher Quinn and Albert Hall, and NYPD Detective John Linder.  Specifically, Brown had been asked to provide information about Emile Dixon, one of the Patio Crew's chief enforcers.

115.    During the course of the proffer, Brown mentioned that a member of the Crew named Pablo had shot someone in 105 Lincoln Road in approximately the early 1990s, and that a man named "Fire" had been wrongfully arrested for the murder.

116.    An FBI report was made of the proffer, which Emile Dixon obtained through discovery in his criminal case.  After his conviction, in an act of benevolence, Dixon disclosed the report to Deacon, the man he knew as "Fire."  Deacon received the report two-and-a-half years after the proffer, in January 2004.

### Dismissal of the Indictment Against Deacon

117.    From prison, it took Deacon over four years to investigate the lead that Dixon provided, but, with the help of investigators, Deacon was finally able to marshal sufficient evidence of his innocence to file a viable petition to vacate his conviction pursuant to New York Criminal Procedure Law § 440.10.  He did so on June 17, 2008.

118.    On November 9, 2011, the Kings County Supreme Court denied his petition.  But on June 20, 2012, the Appellate Division, Second Department, vacated Deacon's conviction and ordered a new trial, *People v. Deacon*, 96 A.D.2d 965 (2d Dep't 2012).

119.    Rather than consenting to dismissal of the indictment, the District Attorney's Office insisted on retrying Deacon for the murder of Anthony Wynn.

120.    At Deacon's second trial, Colleen Campbell testified truthfully about what she had seen on April 1, 1989.  She told the jury that she had taken a good look at the man who had fled with a gun in his hand, and that he was not Derrick Deacon.

121.    On November 18, 2013, Deacon was acquitted of all charges, and the indictment against him was finally dismissed.  It took the jury nine minutes to render its verdict of innocence.

**Deacon's Injuries and Damages**

122.    As a direct and proximate consequence of the aforementioned actions by the Individual Defendants, Plaintiff suffered nearly twenty-five years of imprisonment.  During his incarceration, he sustained severe emotional and mental anguish and pain as a result of being punished for crimes he did not commit.  He was denied effective treatment for his emotional injuries while incarcerated, and continues to suffer mental anguish to this day.

123.    Deacon was also denied the opportunity to pursue normal relationships with, and to enjoy the companionship of, family members and friends.  He missed countless milestones and important events in the life of his family.

124.    Deacon was denied years of gainful employment and income.  His earning power and ability to support himself have been permanently hampered by the years of productive work experience his wrongful imprisonment denied him.

125.    Deacon has been publicly shamed, disgraced, ridiculed, and humiliated.  Nothing can undo the reputational damage he has sustained.

126.    Deacon was denied fundamental constitutional rights and has lost his faith in the American justice system.

## FIRST CAUSE OF ACTION
### (42 U.S.C. § 1983; Malicious Prosecution Against the Officer Defendants)

127.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

128.    The Officer Defendants, including but not limited to defendants Turner and Callahan, initiated, or caused the initiation of, criminal proceedings against Plaintiff.

129.    The Officer Defendants knew that they lacked probable cause to initiate criminal proceedings against Plaintiff.

130.    Prior to Plaintiff's conviction in 1989, and continuing thereafter, the Officer Defendants, acting individually and in concert and conspiracy with one another, covered up, lied to prosecutors about, and withheld knowledge from Plaintiff of *Brady* material.

131.    Disclosure of this *Brady* material would have revealed to prosecutors that they were without probable cause to pursue the criminal case against Plaintiff.

132.    The Officer Defendants knew they had duties under the United States Constitution as well as the laws and regulations of the State and the City of New York (a) to disclose *Brady* material to the Kings County District Attorney's Office so that it could be disclosed to the defense and used to prevent the conviction of Plaintiff based upon false, misleading, or incomplete evidence and argument, and/or (b) to make truthful statements to the prosecution concerning the existence of *Brady* material and not to cause or continue Plaintiff's unconstitutional conviction and resultant injuries by lying about such evidence.

133.    Notwithstanding their awareness of their duties, the Officer Defendants, prior to, during, and following Plaintiff's trial, intentionally, recklessly, and/or with deliberate

indifference to their legal obligations, concealed *Brady* material from, lied about, and otherwise failed to disclose *Brady* material to Plaintiff.

134.    The Officer Defendants acted with actual malice, as demonstrated by, *inter alia*, their decision to ignore valid evidence and investigative leads that pointed to Plaintiff's innocence.

135.    The prosecution terminated in Plaintiff's favor when his conviction was eventually vacated and the indictment against him dismissed on November 18, 2013.

136.    The acts and conduct of the Officer Defendants constitute malicious prosecution in violation of the Fourth Amendment to the United States Constitution.

137.    Upon information and belief, the Officer Defendants knew of one another's wrongful acts and displayed deliberate indifference to Plaintiff's constitutional rights by failing to rectify one another's wrongful acts.

### SECOND CAUSE OF ACTION
**(42 U.S.C. § 1983; Malicious Prosecution Against the Interrogation Defendants)**

138.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

139.    The Interrogation Defendants initiated, or caused the initiation of, criminal proceedings against Plaintiff.

140.    The Interrogation Defendants created false information and fabricated evidence likely to influence the jury—namely, Campbell's false testimony.

141.    The Interrogation Defendants forwarded this false and fabricated information to prosecutors with the express purpose of causing criminal proceedings to be instituted and continued against Plaintiff, even though they could reasonably foresee that their actions would

contribute to the prosecutors' subsequent decision to prosecute Plaintiff and obtain his conviction and imprisonment.

142.    The Interrogation Defendants, individually and collectively, manufactured, acted in concert to manufacture, aided and abetted each other to manufacture, and/or conspired to manufacture testimony that they intended to use against Plaintiff in criminal proceedings and/or caused to be used as a basis for Plaintiff's prosecution and conviction.

143.    The Interrogation Defendants did so knowing that the testimony was false or was highly likely to be false, and/or with deliberate indifference to whether it was true or false.

144.    Without the false or utterly unreliable testimony that the Interrogation Defendants wrongfully manufactured or knew had been wrongfully manufactured, there would have been no basis to prosecute and convict Plaintiff for Wynn's murder.

145.    Thus, the Interrogation Defendants knew that they lacked probable cause to initiate criminal proceedings against Plaintiff.

146.    Additionally, prior to Plaintiff's conviction in 1989, and continuing thereafter, the Individual Defendants, acting individually and in concert and conspiracy with one another, covered up, lied to prosecutors about, and withheld knowledge from Plaintiff of *Brady* material.

147.    The Interrogation Defendants knew they had duties under the United States Constitution as well as the laws and regulations of the State and the City of New York (a) to disclose *Brady* material to the Kings County District Attorney's Office so that it could be disclosed to the defense and used to prevent the conviction of Plaintiff based upon false, misleading, or incomplete evidence and argument, and/or (b) to make truthful statements to the prosecution concerning the existence of *Brady* material and not to cause or continue Plaintiff's unconstitutional conviction and resultant injuries by lying about such evidence.

148.    Notwithstanding their awareness of their duties, the Individual Defendants, prior to, during, and following Plaintiff's trial, intentionally, recklessly, and/or with deliberate indifference to their legal obligations, concealed *Brady* material from, lied about, and otherwise failed to disclose *Brady* material to Plaintiff.

149.    The Interrogation Defendants acted with actual malice, as demonstrated by, *inter alia*, their decision to falsely manufacture probable cause for Plaintiff's arrest and prosecution.

150.    The prosecution terminated in Plaintiff's favor when his conviction was eventually vacated and the indictment against him dismissed on November 18, 2013.

151.    The acts and conduct of the defendants constitute malicious prosecution in violation of the Fourth Amendment to the United States Constitution.

152.    Upon information and belief, the Interrogation Defendants knew of one another's wrongful acts and displayed deliberate indifference to Plaintiff's constitutional rights by failing to rectify one another's wrongful acts.

**THIRD CAUSE OF ACTION**
**(42 U.S.C. §1983; Denial of Due Process and a Fair Trial Against the Officer Defendants)**

153.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

154.    The Officer Defendants, including but not limited to Turner and Callahan, initiated or caused the initiation of criminal proceedings against Plaintiff.

155.    Prior to Plaintiff's conviction in 1989, and continuing thereafter, the Officer Defendants, acting individually and in concert and conspiracy with one another, covered up, lied to prosecutors about, and withheld knowledge from Plaintiff of *Brady* material.

156.    The Officer Defendants knew they had duties under the United States Constitution as well as the laws and regulations of the State and the City of New York (a) to

disclose *Brady* material to the Kings County District Attorney's Office so that the it could be disclosed to the defense and used to prevent the conviction of Plaintiff based upon false, misleading, or incomplete evidence and argument, and/or (b) to make truthful statements to the prosecution concerning the existence of *Brady* material and not to cause or continue Plaintiff's unconstitutional conviction and resultant injuries by lying about such evidence.

157.    Notwithstanding their awareness of their duties, the Officer Defendants, prior to, during, and following Plaintiff's trial, intentionally, recklessly, and/or with deliberate indifference to their legal obligations, concealed *Brady* material from, lied about, and otherwise failed to disclose *Brady* material to Plaintiff.

158.    They did so with the knowledge that their conduct would result in the jury being provided a false or misleading picture of the circumstances surrounding Wynn's murder, and of the reliability and the thoroughness, honesty, and professionalism of the police investigation, and would thereby substantially increase the likelihood of a conviction, in violation of Plaintiff's federal constitutional rights.

159.    The aforesaid conduct of the Officer Defendants operated to deprive Plaintiff of his right to due process and a fair trial under the Fourteenth Amendment of the United States Constitution.

160.    Upon information and belief, the Officer Defendants knew of one another's wrongful acts and displayed deliberate indifference to Plaintiff's constitutional rights by failing to rectify one another's wrongful acts.

**FOURTH CAUSE OF ACTION**
**(42 U.S.C. §1983; Denial of Due Process and a Fair Trial**
**Against Interrogating Defendants)**

161.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

162.    The Interrogating Defendants initiated, or caused the initiation of, criminal proceedings against Plaintiff.

163.    The Interrogating Defendants created false information and fabricated evidence likely to influence the jury.  Their misdeeds include but are not limited to fabrication of Colleen Campbell's perjurious testimony and delivery of threats to induce Campbell into delivering that testimony.

164.    The Interrogating Defendants forwarded this false and fabricated information to prosecutors with the express purpose of causing criminal proceedings to be instituted against Plaintiff, even though they could reasonably foresee that their actions would contribute to the prosecutors' subsequent decision to prosecute Plaintiff and obtain his conviction and imprisonment.


165.    The Interrogating Defendants, individually and collectively, manufactured, acted in concert to manufacture, aided and abetted each other to manufacture, and/or conspired to manufacture testimony that they intended to use against Plaintiff in criminal proceedings and/or caused to be used as a basis for Plaintiff's prosecution and conviction.

166.    The Interrogating Defendants did so knowing that the testimony was false or was highly likely to be false, and/or with deliberate indifference to whether it was true or false.

167.     Without the false or utterly unreliable testimony that the Individual Defendants wrongfully manufactured or knew had been wrongfully manufactured, there would have been no basis to convict Plaintiff for Wynn's murder.

168.    Thus, the Interrogating Defendants knew that they lacked probable cause to initiate criminal proceedings against Plaintiff.

169.    Additionally, prior to Plaintiff's conviction in 1989, and continuing thereafter, the Interrogating Defendants, acting individually and in concert and conspiracy with one another, covered up, lied to prosecutors about, and withheld knowledge from Plaintiff of *Brady* material.

170.    The Interrogating Defendants knew they had duties under the United States Constitution as well as the laws and regulations of the State and the City of New York (a) to disclose *Brady* material to the Kings County District Attorney's Office so that the it could be disclosed to the defense and used to prevent the conviction of Plaintiff based upon false, misleading, or incomplete evidence and argument, and/or (b) to make truthful statements to the prosecution concerning the existence of *Brady* material and not to cause or continue Plaintiff's unconstitutional conviction and resultant injuries by lying about such evidence.

171.    Notwithstanding their awareness of their duties, the Interrogating Defendants, prior to, during, and following Plaintiff's trial, intentionally, recklessly, and/or with deliberate indifference to their legal obligations, concealed *Brady* material from, lied about, and otherwise failed to disclose *Brady* material to Plaintiff.

172.    They did so with the knowledge that their conduct would result in the jury being provided a false or misleading picture of the circumstances surrounding Wynn's murder, and of the reliability and the thoroughness, honesty, and professionalism of the police investigation, and would thereby substantially increase the likelihood of a conviction, in violation of Plaintiff's federal constitutional rights.

173.    The aforesaid conduct of the Interrogating Defendants operated to deprive Plaintiff of his right to due process and a fair trial under the Fourteenth Amendment of the United States Constitution.

174.    Upon information and belief, the Interrogating Defendants knew of one another's wrongful acts and displayed deliberate indifference to Plaintiff's constitutional rights by failing to rectify one another's wrongful acts.

## FIFTH CAUSE OF ACTION
**(Malicious Prosecution Claim Under New York Law Against the City)**

175.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

176.    The Individual Defendants caused the commencement and continuance of criminal proceedings against Plaintiff.

177.    There was no probable cause for criminal proceedings against Plaintiff, and the Individual Defendants knew or should have known as much.

178.    The Individual Defendants acted with actual malice.

179.    The criminal proceedings against Plaintiff terminated in Plaintiff's favor when his convictions were vacated and the indictment against him was dismissed on November 18, 2013.

180.    Defendant City is liable under the doctrine of *respondeat superior* for the unlawful conduct of its employees, Defendants Turner, Callahan, John Doe # 1-5, and John Roe #1-5.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grant the following relief jointly and severally against Defendants:

1.    Compensatory damages in an amount to be determined;

2.      punitive damages against the Individual Defendants in an amount to be

determined;

3.      pre-judgment interest as allowed by law;

4.      an order awarding Plaintiff reasonable attorneys' fees, together with the costs and

disbursements, pursuant to 42 U.S.C. § 1988 and the inherent powers of this Court; and

5.      such other further relief as the Court may deem just and proper.

Dated: February 17, 2015
      New York, New York

                    EMERY CELLI BRINCKERHOFF
                    & ABADY LLP

By:   _____
                 Earl S. Ward
                 O. Andrew F. Wilson
                 Hayley Horowitz
          600 Fifth Avenue, 10th Floor
          New York, New York 10020
          (212) 763-5000


          GLENN A. GARBER, P.C.
              Glenn A. Garber
          The Woolworth Building
          233 Broadway, Suite 2370
          (212) 965-9370


          *Attorneys for Plaintiff*